1
2
3
4
5

# UNITED STATES DISTRICT COURT

6

## DISTRICT OF NEVADA

7
8

UNITED STATES OF AMERICA,               )
                                        )
9            Plaintiff,                  )       Case No.   2:09-cr-00114-KJD-GWF
                                        )
10   vs.                                 )       **FINDINGS & RECOMMENDATIONS**
                                        )
11   JERMAINE SMITH,                     )       **Re: Motion to Suppress (#19)**
                                        )
12           Defendant.                  )
                                        )
13   ————————————————————————————————————)

14          This matter is before the Court on Defendant's Motion to Suppress for Fourth Amendment

15   Violation (#19), filed on June 26, 2009; the Government's Opposition to Defendant's Motion to

16   Suppress (#22), filed on July 10, 2009; and the Defendant's Reply to Government's Opposition (#23),

17   filed on July 16, 2009.

18          The Indictment in this case charges Defendant Jermaine Smith with the crime of felon in

19   possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  The Indictment alleges

20   that Defendant has a prior felony conviction for voluntary manslaughter with use of a deadly weapon.

21   The Indictment alleges that on February 13, 2009, Defendant did knowingly possess a Walther P99, 9

22   millimeter, handgun in violation of the foregoing statutes.  Defendant argues that evidence regarding

23   the handgun and incriminating statements that he allegedly made about possessing the handgun should

24   be suppressed because they resulted from the illegal seizure of Defendant in violation of the Fourth

25   Amendment.  The Court conducted an evidentiary hearing on Defendant's motion on August 10, 2009.

26                          **FACTUAL BACKGROUND**

27          The Government called Las Vegas Metropolitan Police Officer Tyler Dominguez as its sole

28   witness during the evidentiary hearing.  The Defendant presented testimony by Glenn Meek, an

1   investigator for the Federal Public Defenders Officer regarding his inspection of the area where the

2   events leading to Defendant's arrest occurred and a video recording of the area that the investigators

3   prepared.  Defendant Smith also testified at the hearing.

4        Officer Dominguez testified that he has been employed as a uniformed patrol officer with the

5   Las Vegas Metropolitan Police Department ("Metro") for the past three years.  He testified that on

6   February 13, 2009 at approximately 11:45 a.m. he was patrolling in a marked police car in the vicinity

7   of Morgan Avenue in Las Vegas, Nevada.  Morgan Avenue is an east-west residential street that is

8   bounded on the west by J Street and on the east by I Street.  Officer Dominguez testified Morgan

9   Avenue is located in a  "Section Eight" public housing complex known as Marble Manor.  The houses

10  on Morgan Avenue are single story residences.  Morgan Avenue is approximately 30 feet wide, which

11  allows for vehicles to be parked on either side of the street and for a single lane of traffic in each

12  direction.

13       Officer Dominguez testified that Morgan Avenue is in a "high crime area" in which numerous

14  narcotics offences, robberies and other violent, gang-related crimes occur.  He testified that one of the

15  housing complexes in the area is referred to as "the Coast" because members of a west-coast criminal

16  gang are known or believed to reside there.  Officer Dominguez testified that the management of the

17  Marble Manor housing complex has posted "no-trespassing" signs on the residences on Morgan

18  Avenue and the adjacent streets, and have requested Metro's assistance in strictly enforcing the "no-

19  trespassing" restrictions.  According to Officer Dominguez, police officers attempt to make contact

20  with every adult male they observe in the area to determine if they reside in the housing complex or are

21  authorized visitors of a resident of the complex.  If the individual is not a resident or authorized visitor,

22  then the officers will enforce the "no-trespassing" restrictions against him.  Officer Dominguez also

23  testified that it is his understanding that only single mothers and their minor children may reside in the

24  Section Eight housing.  He further testified that because of the high level of criminal activity in the area,

25  the no-trespassing restrictions, and the residency restrictions, it is his opinion that the police have

26  "reasonable suspicion" to detain any adult males found in the area.

27       Officer Dominguez testified that on the date of the incident, he turned onto eastbound Morgan

28  Avenue from J Street.  As he drove east on Morgan Avenue, he observed the Defendant, who was

2

1   walking "almost at a jog," proceed from the premises of a community center, which is located on the

2   south side of Morgan Avenue near its eastern end, toward the curb.  According to Officer Dominguez,

3   as Defendant reached the curb, he looked toward the officer's vehicle and then proceeded across the

4   street in a northeasterly direction at approximately a forty-five degree angle.  Officer Dominguez

5   thereupon activated the emergency lights on his patrol vehicle.  He also briefly activated the vehicle's

6   siren twice, which he described as "chirping."  He testified that this was intended to get the Defendant's

7   attention and cause him to stop.  He testified, however, that Defendant continued to walk away.

8        Officer Dominguez testified that he then brought his vehicle to a stop facing the north side of

9   Morgan Avenue where Defendant had crossed the street.  He thereupon exited his vehicle and said to

10  Defendant:  "Come over here and talk to me real quick."  The Defendant, who was continuing to walk

11  away, turned his head toward the officer and responded:  "Who me?"  Officer Dominguez responded:

12  "Yes, you."  Defendant continued to walk away and according to Officer Dominguez entered the yard

13  of one of the houses that had a posted "no-trespassing" sign.  Officer Dominguez testified that he again

14  instructed Defendant to come to him and Defendant again responded "Who me?"  The Officer again

15  said: "Yes you, stand in front of my car.  While continuing to walk away, Defendant looked over his

16  shoulder at Officer Dominguez and made a hand gesture as if waiving the officer away, and stated "Ah

17  man, fuck you."

18       Officer Dominguez testified that he thereupon moved around the front of his vehicle to

19  approach the Defendant.  The Defendant took off running in an easterly direction and the officer

20  pursued him.  Before he ran, the Defendant appeared to be fumbling with something in his waist band.

21  Officer Dominguez was not sure if Defendant was reaching for a weapon or was trying to pull his pants

22  up.  During the pursuit, Defendant continued to move his hands around his waistband area.  Officer

23  Dominguez testified that he pulled his tazer weapon and instructed the Defendant to stop, but he did not

24  do so.  Eventually, Defendant's loose fitting pants fell down around his feet and caused him to trip.

25  Officer Dominguez caught up to Defendant who was on the ground.  Officer Dominguez testified that

26  as he approached the Defendant to place him in handcuffs, the Defendant stated that he had a handgun

27  in his pocket.  Officer Dominguez placed Defendant in handcuffs and performed a pat down search

28  during which he recovered the handgun in Defendant's pocket.

1        Officer Dominguez acknowledged on cross-examination that the arrest report he prepared

2   shortly after the incident stated that he observed Defendant "jaywalking northbound across Morgan

3   Avenue just west of I Street."   The report did not state that Defendant crossed the street at a forty-five

4   degree angle or diagonally.   Officer Dominguez's arrest report also stated that "[w]hen I initiated the

5   stop with red lights and sirens to announce myself to the male, he turned westbound toward me."

6   Officer Dominguez acknowledged that his report did not describe Defendant as turning only his head in

7   the officer's direction as he walked away from the officer.   Officer Dominguez testified, however, that

8   Defendant, in fact, turned only his head toward the officer, and not his body.

9        Defendant Smith testified that on February 13, 2009, he left his mother's residence which is

10   located in the vicinity of Morgan Avenue with the intention of visiting his girlfriend who also resided in

11   the area.   Defendant testified that he entered Morgan Avenue from J Street on the west and then walked

12   east on Morgan Avenue on the south side of the street.   As he neared the eastern end of Morgan

13   Avenue, he decided to visit a friend, "Waneeka," whose apartment or house was located on the north

14   side of Morgan Avenue.   Defendant testified that he walked "directly across" the street , i.e. at a 90

15   degree angle, toward Waneeka's house.

16        Defendant testified that he walked up onto the porch of the house and as he was about to knock

17   on the door, he heard the "chirping" of the police car's siren.   At that point, he turned around and saw

18   the police car.   Defendant testified that the officer was inside the police car and motioned to Defendant

19   with his hand for the Defendant to come towards the car.   Defendant testified that he stepped off the

20   porch and walked towards the police car.   As Defendant reached the middle of the yard, the officer

21   stepped out of the police car and yelled at him to get in front of the vehicle.   Defendant testified that he

22   responded:   "For what?"   The officer again yelled for him to get in front of the car.   Defendant again

23   said "For what?"   Defendant testified that he asked the officer if he was under arrest.   The officer said

24   no and again instructed him to get in front of the police car.   Defendant testified that he began to back-

25   up after the officer told him the second time to get in front of the police car.   After the officer told him

26   the third time to get in front of the car, Defendant saw the officer reach for his gun.   At that point,

27   Defendant testified that he turned and took off running.   Defendant did not testify in response to Officer

28

Dominguez's description of the ensuing pursuit.[1]

## DISCUSSION

**1.      Whether the Officer Had Probable Cause or Reasonable Suspicion to Stop and Detain Defendant Before He Fled.**

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures."  U.S. Const. Amend. IV.  Evidence obtained in violation of the Fourth Amendment, and evidence derived from it, may be suppressed as the "fruit of the poisonous tree."  *Wong Sun v. United States*, 371 U.S. 471 (1963).

Police officers may stop and detain an individual when they have reasonable suspicion or probable cause to believe that the person has committed a crime.  *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007), citing *Michigan v. Summers*, 452 U.S. 692, 700, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).  Police officers have probable cause to arrest when a person commits a misdemeanor crime in their presence.  *Atwater v. City of Lago Vista*, 532 U.S. 318, 121 S.Ct. 1536 (2001).  Law enforcement officers may stop and briefly detain an individual when they have reasonable suspicion to believe that the person is engaged in or about to engage in criminal activity.  *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968).  "Reasonable suspicion consists of 'specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'"  *United States v. Diaz-Juarez*, 299 F.3d 1138, 1141 (9th Cir. 2002).

The first issue is whether Officer Dominguez had probable cause to stop Defendant for "jaywalking."  "Jaywalking" is governed by Sections 11.30.050-11.30.070 of the Las Vegas Municipal

---

[1]At the conclusion of the evidentiary hearing, Defendant's counsel stated that his investigator made inquiries during the hearing and determined that, contrary to Officer Dominguez's testimony, "Section Eight" housing is not restricted to mothers and their minor children.  The Court indicated that if the parties were not able to reach a stipulation on this factual issue, it would consider allowing Defendant to reopen the hearing on this issue.  Because the officer did not have reasonable suspicion to stop Defendant prior to his flight, regardless of whether "Section Eight" housing is restricted to mothers and their minor children, resolution of this issue is not relevant to the Court's decision.  There is no need, therefore, to reopen the hearing on this basis.

1  Code.  Section 11.30.050 states:

2     No pedestrian shall cross a roadway at any place other than by a route at
3  right angles to the curb or by the shortest route to the opposite curb
except in a crosswalk.

4  Section 11.30.070 further provides:

5  (A) Between adjacent intersections at which traffic control signals are in
operation, pedestrians shall not cross at any place except in a crosswalk.

6
7  (B) No pedestrian shall cross a roadway other than within a marked
crosswalk or within an unmarked crosswalk in a central traffic district or
in any business district.

8

9     There is no dispute that Morgan Avenue is a residential street located within a residential

10  housing area.  It is not in a "central traffic district" as defined in Section 11.02.140 of the Municipal

11  Code.  Although there was disputed testimony whether Morgan Avenue has a high volume of vehicle

12  traffic, this is not a determining factor whether a pedestrian may cross at a location other than a

13  crosswalk.  A pedestrian who is crossing a street outside a crosswalk must, however, yield to vehicles

14  on the roadway.  Section 11.30.060 (A).  In any event, the Court is not persuaded by Officer

15  Dominguez's testimony that Morgan Avenue has a high volume of vehicle traffic.  Nor is there

16  evidence that at the time Defendant crossed the street, there were any other moving vehicles on Morgan

17  Avenue other than the officer's patrol car.  Additionally, no evidence was presented whether traffic

18  control signals are located at either end of Morgan Avenue.  The video recording did not depict stop

19  lights or stop signs at any location along the street.

20     The sole issue therefore is whether Defendant violated Section 11.30.050 by not crossing the

21  street at a right angle to the curb or by the shortest route to the opposite curb.  The testimony is

22  disputed.  Officer Dominguez testified that he observed Defendant Smith crossing Morgan Avenue at a

23  45 degree angle in a "northeasterly" direction.  Defendant Smith testified, however, that he walked

24  directly across the street from one side to the other.  While the Court finds that Officer Dominguez was

25  generally credible in his factual testimony,[2] his arrest report, prepared shortly after the incident, stated

26

27     [2]The officer offered opinions about reasonable suspicion or the police officers' authority to stop
28  and detain individuals to which the Court clearly does not subscribe.

6

1   only that he observed Defendant "jaywalking northbound across Morgan Avenue just west of I Street."

2   His report makes no mention of Defendant walking across the street in a "northeasterly" direction or at

3   a 45 degree angle.  Although there are also obvious issues concerning the Defendant's credibility, the

4   Court concludes that the Government has not met its burden of proof by a preponderance of the

5   evidence that Defendant crossed Morgan Avenue in a manner that violates Section 11.30.50.

6          The Court also concludes that Officer Dominguez did not otherwise have reasonable suspicion

7   to stop the Defendant prior to his flight from the officer.  Officer Dominguez testified that when he first

8   observed Defendant, he was moving "at a near jog" from the Community Center on the south side of

9   Morgan Avenue toward the street.  The Court interprets this testimony to mean that Defendant was

10  walking at a fast or brisk pace.  That, by itself, is not a suspicious circumstance.  Officer Dominguez

11  pointed to no other suspicious behavior by Defendant, other than his possibly changing his route when

12  he observed the officer's vehicle.  Although Officer Dominguez testified that the buildings along

13  Morgan Avenue are posted with "no-trespassing" signs, and the housing complex management relies on

14  the police to strictly enforce those restrictions, Officer Dominguez had no information that Defendant

15  Smith was trespassing on the property from which he appeared to be coming -- the Community Center.

16         Defendant's presence in a high crime area could not alone provide reasonable suspicion that he

17  had committed or was about to commit a crime.  *United States v. Diaz-Juarez*, 299 F.3d 1138, 1142 (9th

18  Cir. 2002), *citing Brown v Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637 (1979).  *See also Illinois v. Wardlow*,

19  528 U.S. 119, 120 S.Ct. 673, 676 (2000).  *Diaz-Juarez* also states that "[r]easonable suspicion may not

20  be based on broad profiles which cast suspicion on entire categories of people without any

21  individualized suspicion of the particular person to be stopped.  *Id.*, at 1141.  *See also United States v.*

22  *Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007).   The Court therefore concludes that Officer

23  Dominguez did not have probable cause or reasonable suspicion to stop and detain Defendant prior to

24  his attempt to flee from the officer.

25         **2.**    **Whether Defendant Was "Seized" Within the Meaning of the Fourth Amendment.**

26         Even if a police officer lacks probable cause to arrest or reasonable suspicion to detain, there is

27  no Fourth Amendment violation unless the officer seizes the individual.  The Government contends that

28  Defendant Smith was not seized within the meaning of the Fourth Amendment until after he fled and

1  was captured.   Defendant argues, however, that he was seized when he initially, albeit briefly,

2  submitted to Officer Dominguez's show of authority.

3       In *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547 (1991), the Supreme Court held that a

4  person is not seized within the meaning of the Fourth Amendment unless the person is physically forced

5  to stop or the person submits to the officer's show of authority.  In *Hodari D.*, a group of youths fled

6  when they observed the police officers' vehicle.  One of the officers chased the respondent on foot.

7  During the pursuit, the respondent threw away an object which was later determined to be cocaine.  The

8  Court noted that under the traditional common-law definition of arrest, which is "the quintessential

9  'seizure of the person' under the Fourth Amendment," a person is arrested when an officer touches him,

10 however slightly, with the purpose of taking him into custody.  *Id.,* 111 S.Ct. at 1550. The Court noted

11 that Hodari was not touched by the officer until after he threw away the evidence.  Respondent argued,

12 however, that he was seized prior to that point because "a seizure occurs 'when the officer, by means of

13 physical force or *show of authority*, has in some way restrained the liberty of a citizen.'"  *Id.*  In

14 rejecting this argument, the Court stated:

15       The language of the Fourth Amendment cannot sustain respondent's
16       contention.  The word "seizure" readily bears the meaning of a laying on
         of hands or application of physical force to restrain movement, even
         when it is ultimately unsuccessful.  ("She seized the purse-snatcher, but
17       he broke out of her grasp.")  It does not remotely apply, however, to the
         prospect of a policeman yelling "Stop, in the name of the law!" at a
18       fleeing form that continues to flee.  That is no seizure.  Nor can the result
         respondent wishes to achieve be produced -- indirectly, as it were -- by
19       suggesting that [the officer's] uncomplied-with show of authority was a
         common-law arrest, and then appealing to the principle that all common-
20       law arrests are seizures.  An arrest requires *either* physical force (as
         described above) *or,* where that is absent, *submission* to the assertion of
21       authority.

22 *Hodari*, 111 S.Ct. at 1550-51.

23       The Court also stated that on policy grounds, the exclusionary rule should not be applied to

24 those circumstances in which a person refuses to submit to a police officer's allegedly unlawful order to

25 stop.  *Id.*, 111 S.Ct. at 1551.

26       In *United States v. Morgan*, 936 F.2d 1561 (10th Cir. 1991), which was decided shortly after

27 *Hodari D.*, a police officer followed a vehicle containing bank robbery suspects for several blocks with

28 his red lights on.  The suspects' vehicle turned into the driveway of a residence and the officer pulled

8

1  into the driveway behind it.  When the suspects exited the vehicle, the officer told them to hold up.  The

2  defendant asked the officer "What do you want?"  The officer responded, "Just hold it right there."  The

3  defendant started to back up and the officer told him not to flee.  The defendant, however, fled and was

4  pursued and captured by the officer.  During the pursuit, the defendant threw away a bag that was

5  subsequently determined to contain evidence of the bank robbery.  In holding that the Defendant was

6  seized prior to his flight, the Tenth Circuit stated:

7          However, since Officer Eubanks followed the car in which Defendant
        was a passenger for several blocks with his red lights flashing; since
8          Officer Eubanks exited from a marked patrol car, in uniform, and asked
        Defendant to hold up; and since Defendant, at least momentarily, *yielded*
9          to the Officer's apparent show of authority, we find Mr. Morgan was
        seized for purposes of the Fourth Amendment during the initial portion of
10         the encounter. *Cf. Hodari D.*, 111 S.Ct. at 1550 ("[On] [t]he narrow
        question . . . [of] whether, with respect to a show of authority . . . a
11         seizure occurs even though the suspect *does not yield*.  We hold that it
        does not."  (Emphasis added.)).

12

13  *Morgan*, 936 F.2d at 1567.

14          In *United States v. Hernandez*, 27 F.3d 1403 (9th Cir. 1994), a police officer observed defendant

15  jump over a fence into an alley and run to the apartment building's gate.  Suspecting criminal activity,

16  the officer approached defendant, announced that he was a police officer and that he needed to talk to

17  him.  The defendant reached into his waistband in a drawing motion, looked directly at the officer and

18  then turned and attempted to climb the gate.  A brief struggle ensued, but the defendant was able escape

19  the officer's grasp and initially run away.  The officer took cover behind a pillar and drew his gun.  The

20  defendant also drew a gun, stopped and looked over his shoulder at the officer.  The defendant then

21  threw the gun away and again fled.  A few minutes later he was apprehended by other officers.  In

22  holding that there was no seizure, the court distinguished *Morgan* as follows:

23          [A]lthough the court in *Morgan* found the defendant's momentary
        hesitation relevant, this hesitation was not the only factor on which the
24          court based its conclusion that a seizure had occurred.  Other crucial
        factors existed, including that defendant was in a car which was being
25          followed by an officer with his overhead lights activated; the car pulled
        over; and after the defendant left the car, he verbally responded to the
26          officer's show of authority.  *Morgan*, 936 F.2d at 1567.  None of these
        additional factors existed in Hernandez's case.

27

28  *Hernandez*, 27 F.3d at 1407.

9

1   The court further stated:

2       We decline to adopt a rule whereby momentary hesitation and direct eye
3       contact prior to flight constitutes submission to a show of authority. Such
        a rule would encourage suspects to flee after the slightest contact with an
        officer in order to discard evidence, and yet still maintain Fourth
4       Amendment protections. A seizure does not occur if an officer applies
        physical force in an attempt to detain a suspect but such force is
5       ineffective. *See Hodari*, 499 U.S. at 625, 111 S.Ct. at 1550.

6   *Id.*

7       The Ninth Circuit's decision in *Hernandez* did not specifically reject the holding in *Morgan*, but

8   instead distinguished it on the facts. Defendant argues that the facts described in his version of events

9   are closer to the facts in *Morgan* and therefore support a finding that he was seized because of his initial

10  submission to Officer Dominguez's show of authority.

11      The Court finds that the facts of this case are more similar to those in *United States v. Valentine*,

12  232 F.3d 350 (3rd Cir. 2000) than to either *Morgan* or *Hernandez.* In *Valentine,* two uniformed officers

13  were told by an informant that he had just seen a man with a gun. The officers then observed a group of

14  three men in a parking lot, one of whom matched the informant's description. The officers stopped and

15  stepped out of their patrol vehicle near the men. The men responded by walking away from the

16  officers. According to the government, one of the officers ordered the defendant, who was

17  approximately 10 feet away from the officer, to stop and come over and place his hands on the police

18  car. Defendant responded "Who me?" and then charged toward the officer in an effort to flee around

19  him. Defendant's attempt to escape was unsuccessful and he dropped a gun when the officer wrestled

20  him to the ground. According to the defendant, however, when the officer ordered him to come over

21  and place his hands on the police car, "he momentarily 'complied' with the order, stopped, and gave his

22  name." *Valentine*, 232 F.3d at 359. In rejecting defendant's assertion that this testimony supported a

23  finding that he was seized prior to flight, the Third Circuit, citing *Hernandez* and other similar

24  decisions, stated: "Even if Valentine paused for a few moments and gave his name, he did not submit

25  in any realistic sense to the officers' show of authority, and therefore there was no seizure until Officer

26  Woodard grabbed him." *Id.*

27      According to Officer Dominguez, Defendant did not stop walking away from the officer after he

28  activated the emergency lights and "chirped" his siren. Officer Dominguez then exited the patrol

10

1   vehicle and repeatedly instructed Defendant to stop and come to his patrol vehicle.  Defendant did not

2   stop walking away, but did look over his shoulder at the officer and respond by asking "Who me?"

3   Officer Dominguez testified that Defendant appeared to be gauging his ability to flee before he took off

4   running.  Under the Officer Dominguez's version, it is clear that Defendant never submitted to the

5   officer's show of authority and therefore was not seized.

6          According to Defendant Smith, however, he had actually reached the front door of his friend's

7   residence when he heard the "chirping" of the siren.  He turned around and responded to the officer's

8   physical gestures by moving approximately half-way across the yard toward the patrol car.  Although

9   Defendant's testimony, if accepted, could be construed as initial compliance with the officer's

10  instruction, it is also consistent with Defendant positioning himself for flight.  By his own testimony,

11  Defendant did not comply when the officer told him three times to get in front of the patrol car.

12  Instead, Defendant responding by asking "For what?"  Defendant acknowledged that after the second

13  instruction, he backed away and then ran when he saw the officer reaching for his gun.  Like the Third

14  Circuit in *Alexander*, this Court concludes that even under Defendant's version, he did not submit in

15  any realistic sense to the officer's show of authority.  The Court therefore finds that Defendant was not

16  seized prior to his flight from the officer.

17          **3.      Whether Defendant's Flight Was An Intervening Event Which Purged the**
              **Taint Of The Allegedly Unlawful Seizure.**
18

19          The Government also argues that even if Defendant Smith was seized prior to running away, his

20  subsequent flight was an intervening event that purged the taint of the unlawful seizure.  In support of

21  its argument, the Government relies on *Garcia v. United States*, 516 F.2d 318 (9th Cir. 1975).

22          In *Garcia*, the defendant's vehicle was stopped at the fixed Border Patrol checkpoint located on

23  Interstate Highway 5 at San Clemente, California.  The officer at the checkpoint observed certain facts

24  that made him suspicious that defendant might be smuggling aliens.  The officer directed defendant to a

25  secondary inspection area for further inquiry.  Defendant stopped momentarily in the inspection area,

26  but then sped off.  After a high speed chase, defendant's vehicle was stopped.   Investigation revealed

27  that he was an illegal alien and a search of the vehicle's trunk resulted in the discovery of a large

28  quantity of marijuana.  In affirming the denial of defendant's motion to suppress, the Ninth Circuit

assumed that the initial stop at the checkpoint was illegal. 516 F.2d at 319. The court stated:

> The remaining fact before the court is that Martinez-Lopez fled after he was ordered to stop. He argues that this evidence is tainted by the checkpoint stop. Thus, assuming the illegality of the stop, the question is whether "the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), quoting Maguire, Evidence of Guilt 221 (1959). Here, the Border Patrol officers did not exploit the illegal stop in any way. The flight was the voluntary conduct of Martinez-Lopez. See McClure v. United States, 332 F.2d 19, 22 (9th Cir. 1964), cert. denied, 380 U.S. 945, 85 S.Ct. 1027, 13 L.Ed.2d 963 (1965).
>
> If there were evidence in the record that the checkpoint at San Clemente was designed to lure suspected criminals into flight from law enforcement officers, we might reach a different conclusion.  Where a suspect's act is the intended result of illegal police conduct, or ensuing police action, it is likely to prove tainted.  Allen v. Cupp, 426 F.2d 756, 759 (1970); see Wong Sun v. United States, supra, 371 U.S. at 486 & n. 12, 83 S.Ct. 407; United States v. Basurto, 497 F.2d 781, 790-91 (9th Cir. 1974); Ruiz v. Craven, 425 F.2d 235, 236 (9th Cir. 1970). But where the illegal conduct of the police is only a necessary condition leading up to the suspect's act, no taint attaches to his conduct; a "but-for" connection alone is insufficient.  Allen v. Cupp, supra, 426 F.2d at 759; see United States v. Bacall, 443 F.2d 1050, 1057 (9th Cir.), cert. denied, 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971). In this case, the illegal stop was no more than part of a series of facts leading up to the subsequent flight. By ordering Martinez-Lopez to stop, the officer could hardly have intended him to flee.

*Garcia*, 516 F.2d at 319-20.

Defendant attempts to distinguish *Garcia* on the grounds that the seizure occurred at a fixed border checkpoint where the government's interests are extremely strong and Fourth Amendment protections are lessened.  Defendant also argues that *Garcia* is distinguishable because the officer had untainted reasonable suspicion to stop defendant's car before his subsequent flight.  However, neither of these factors were relevant to the court's decision.

Defendant also suggests that *Garcia* is dated and inconsistent with subsequent Ninth Circuit case law regarding what is required to purge the taint of an illegal seizure.  The Ninth Circuit has, however, subsequently cited *Garcia* as a correct statement of law in regard to the type of intervening circumstance present in that case.  In *United States v. Ramirez*, 91 F.3d 1297, 1303 (9th Cir. 1996), the court distinguished *Garcia* based on materially different facts.  The court also stated, however, that "when an officer is engaging in an illegal arrest, if the suspect engages in illegal resistance, that new

1   violation may well justify a new and proper arrest.  (Citation omitted).  We reached just that conclusion

2   in *United States v. Garcia*, 516 F.2d 318 (9th Cir.), *cert. denied,*  423 U.S. 934, 96 S.Ct. 290, 46

3   L.Ed.2d265 (1975)."  The decision in *Garcia* also appears to be the view adopted by other circuits

4   which have considered the issue.  *See United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995), citing

5   decisions from the Fifth, Tenth and Eleventh Circuits.

6           Defendant also argues that *Garcia*  is contrary to *United States v. Washington*, 387 F.3d 1060,

7   1073-75 (9th Cir. 2004).  According to Defendant, *Washington* lists the exclusive types of intervening

8   circumstances that may purge the taint of an illegal seizure: release from custody, an appearance before

9   a magistrate, or consultation with an attorney.  Defendant's argument is erroneous.  First, *Washington*

10  involved the issue of whether the defendants' execution of a consent to search form following an illegal

11  detention was sufficient to purge the taint.  The court held it was not.  The court did not hold that the

12  passage of a certain amount of time, or the other examples cited above, are the only types of intervening

13  events which are sufficient to purge the taint of an illegal seizure.  As *Garcia* and similar cases make

14  clear, a suspect's flight or resistance to an unlawful seizure may also be an intervening event which

15  gives rise to a new finding of reasonable suspicion or probable cause.

16          There is no evidence in this case that would support a finding that Officer Dominguez intended

17  to lure or induce Defendant into fleeing.  Therefore, even if there was an initial unlawful seizure of

18  Defendant, his subsequent flight can be considered in determining whether Officer Dominguez *then* had

19  reasonable suspicion to detain him.  In *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 676 (2000),

20  the Supreme Court held that police officers had reasonable suspicion to pursue and detain an individual

21  who fled when he observed the approaching police officers.  The finding of reasonable suspicion was

22  supported by the fact that the incident occurred in a high crime area.  In this case, there is undisputed

23  testimony that the area in which Officer Dominguez encountered Defendant is a high crime area.  Based

24  on Defendant's flight from the officer, together with the fact that the incident occurred in a high crime

25  area, the Court concludes that Officer Dominguez had reasonable suspicion to believe Defendant was

26  engaged in criminal activity.  Accordingly, the Officer lawfully pursued and detained the Defendant.

27  When Officer Dominguez caught up to the Defendant, and before he restrained him, the Defendant told

28  the officer that he had a gun in his pocket.  The Officer then performed a protective pat down search

13

1   and retrieved the weapon.

2   **CONCLUSION**

3       The Court concludes that Defendant was not seized by the police officer prior to his attempt to

4   flee.  Therefore, the police officer did not violate the Defendant's Fourth Amendment rights prior to his

5   attempt to flee.  Alternatively, the Court concludes that Defendant's attempt to flee was an intervening

6   event that purged the taint of any initial unlawful seizure.  Once the Defendant fled, the police officer

7   had reasonable suspicion to detain him. The police officer did not violate the Fourth Amendment.

8   Accordingly,

9   **RECOMMENDATION**

10       **IT IS RECOMMENDED** that Defendant's Motion to Suppress for Fourth Amendment

11   Violation (#19) be **denied**.

12   **NOTICE**

13       Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in

14   writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has held that the

15   courts of appeal may determine that an appeal has been waived due to the failure to file objections

16   within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1)

17   failure to file objections within the specified time and (2) failure to properly address and brief the

18   objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues

19   from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi*

20   *Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

21       DATED this 14th day of August, 2009.

22

23                        GEORGE FOLEY, JR.

                      United States Magistrate Judge

24

25

26

27

28

14